IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 5, 2021

## STATE OF TENNESSEE v. KEJUAN KING

**Appeal from the Criminal Court for Shelby County**
**No. 1703227 James M. Lammey, Judge**

_____

### No. W2020-01628-CCA-R3-CD

_____

A Shelby County jury convicted the Defendant, Kejuan King, of second degree murder, and the trial court sentenced him to twenty-five years in the Tennessee Department of Correction. On appeal, the Defendant asserts that: (1) the trial court erred by excluding evidence of the victim's "prior threats, violent provocations, and other prior bad acts toward the defendant and others," (2) the State failed to properly manage evidence, and (3) the evidence was insufficient to support his conviction because he acted in self-defense. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Claiborne H. Ferguson (on appeal) and Chloe P. Hawes (on appeal), and Charles E. Waldman (at trial), Memphis, Tennessee, for the appellant, Kejuan King.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jamie B. Kidd and Stephanie Z. Johnson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

On January 13, 2017, the Defendant shot and killed his sister's husband, Adarrell Anderson ("the victim"), at a gas station in Memphis, Tennessee. Following a police investigation, a Shelby County grand jury indicted the Defendant for second degree murder. At trial, the parties presented the following evidence:

On the afternoon of January 13, 2017, David Monger met his godson, Anthony Holloway, at the Grizzly Mart to loan him ten dollars. Mr. Monger parked his van facing the front of the store by pump five, leaving his brother-in-law, Biryce Brown, seated in the passenger seat. Mr. Monger met Mr. Holloway at the front door of the store, and the men entered the store together. While inside the store, Mr. Monger noticed people running out of the store. Mr. Monger inquired about the commotion and learned that someone had been shot. Mr. Monger went outside and found the victim leaned up against Mr. Monger's van. He also found fresh bullet holes on the exterior of his van. Mr. Monger knew neither the victim nor the Defendant.

While Mr. Monger and Mr. Holloway were inside the store, Mr. Brown watched the victim exit the same car Mr. Holloway had arrived in and walk to Mr. Brown's right, along the length of the van. Mr. Brown recalled that a silver car ("Hyundai") had pulled up to pump number four, to the right of the van. The Hyundai was parked facing the street, opposite the van which was facing the Grizzly Mart. After the victim walked past the passenger seat where Mr. Brown was seated and outside his line of vision, Mr. Brown continued looking straight ahead at the store. He heard talking and then shooting, followed by "something like fell up against the van," and then more shooting.

Mr. Brown crawled into the driver's seat of the van, exited through the driver's door, and ran toward the store. As he neared the store, Mr. Monger and Mr. Holloway were exiting the store and asked him what had happened. Mr. Brown told the men that someone had been shot. He turned around to look at the van and saw the victim leaned against the van. Mr. Brown heard someone say, "Come on. Come on" and then he saw a black female run from the store to the Hyundai and drive away.

Mr. Holloway, at the time of trial, was serving a two-year sentence for violating his probation sentence related to burglary and theft. Mr. Holloway recounted the events leading up to the shooting. Julin Sanders drove Mr. Holloway and the victim to the Grizzly Mart to meet Mr. Monger. As they neared the Grizzly Mart, Mr. Holloway noticed a silver Hyundai behind them. The Hyundai pulled up next to a gas pump, and Mr. Holloway saw the Defendant in the passenger seat. In response to seeing the Defendant, the victim stated, "here go [the Defendant]."

After seeing the Defendant, Mr. Sanders parked his black Dodge Nitro in front of the store. Mr. Holloway went inside the store, talked to Mr. Monger, who lent Mr. Holloway some money, and then, while waiting in line, Mr. Holloway heard gunfire. Mr. Holloway saw a female run out of the store and drive off in the Hyundai with the Defendant. Mr. Holloway called the victim's family and then 911. Mr. Holloway provided a police statement and identified the Defendant as the shooter in a photographic line up. He also identified the Defendant as the shooter in the courtroom at trial. Mr.

Holloway denied any plans to meet the Defendant on the day of the shooting. He maintained that they went to the Grizzly Mart to meet Mr. Monger.

On cross-examination, Mr. Holloway agreed that his police statement indicated that he had told the police that, upon seeing the Defendant when they arrived at the Grizzly Mart, the victim stated, "There go that ni**a I got into it with." He noted, however, that he did not remember making that statement to the police. Mr. Holloway confirmed that the victim was his cousin and that he and the victim were very close and saw each other daily. He denied any knowledge of the substance of the prior disagreement between the victim and the Defendant.

Mr. Sanders, who drove the victim and Mr. Holloway to the Grizzly Mart in his Dodge Nitro, recalled that the men had been at the victim's house located a short distance from the Grizzly Mart when Mr. Holloway called Mr. Monger to arrange to borrow some money. As the men entered the parking lot, the victim said, "hey, look there go [the Defendant]." Mr. Sanders stated that the Defendant was a passenger in a Hyundai that was also entering the Grizzly Mart parking lot. Mr. Sanders parked his Dodge Nitro in front of the store while the Hyundai drove up to a gas pump.

Mr. Holloway exited the Dodge Nitro and went inside the Grizzly Mart while Mr. Sanders and the victim began walking toward the Hyundai. As they walked, Mr. Sanders received a phone call, so he "turned back" to answer the phone. The victim continued walking toward the Hyundai. When Mr. Sanders finished his phone call, the victim had "just arrived" at the Hyundai and "shots rang out." Mr. Sanders testified that the events occurred so quickly that, "It wasn't an altercation, couldn't have been no words or anything." After the shooting, Mr. Sanders observed the female driver run out of the store, get into the Hyundai, and drive away. Mr. Sanders spoke with the police following the shooting and told them that the Defendant had shot the victim. He also identified a picture of the Defendant in a photographic line-up, and he identified him in the courtroom at trial.

At the time of trial, Mr. Sanders was serving time for a probation violation for a simple possession conviction.

On cross-examination, Mr. Sanders admitted that he did not see the gun the Defendant fired but insisted that he saw the Defendant's arm and hand raise up into a shooting position. He explained in more detail that, after he exited his car to walk over to the Hyundai, his phone, which was still in his car, rang. He returned to the car to retrieve it and when he turned back around, he witnessed the Defendant, who was seated in the passenger seat of the Hyundai, shoot the victim through the open car window. Mr.

Sanders handed his cell phone to Mr. Holloway, who had just exited the store, and walked to the victim.

Mr. Sanders testified that when the victim got out of the Dodge Nitro, he told the victim not to go over to the Hyundai because "he knew that [the Defendant] had a gun." Mr. Sanders reviewed his January 13, 2017 statement to the police and denied that he told the police that he sat in his vehicle talking on the phone for two minutes after the victim exited the car. Mr. Sanders agreed that he told the police that while he and the victim were still seated in his Dodge Nitro, he told the victim not to approach the Defendant "to try and fight him . . . [b]ecause [the victim] don't know if [the Defendant] got a gun or what." The victim exited Mr. Sanders's vehicle anyway.

On redirect examination, Mr. Sanders testified that he told the police that, after he warned the victim not to approach the Defendant, the victim responded that he was going to try to talk with the Defendant.

Memphis Police Department ("MPD") officers Gregory Turner and Nate Lenow responded to a shooting scene at a Grizzly Mart located at the corner of Horn Lake Road and Shelby Drive. At the scene, Officer Turner found a "male black unresponsive laying [sic] against a white utility van." Shortly thereafter, paramedics arrived and stated that the victim was deceased. Witnesses at the scene provided information that led the police to develop the Defendant as a suspect. Police also learned from witnesses that the Defendant had been a passenger in a silver Hyundai driven by Nakia Moore.

MPD Crime Scene officer David Smith collected a "spent casing" found on the victim's leg and observed a bullet defect to the hooded area of the victim's sweatshirt. In the area near the victim, police identified a bullet strike to the passenger rear side of the van and a possible bullet strike to the ground.

MPD Sergeant James K. Smith processed the silver 2002 Hyundai Accent involved in this case, the results of which were one fingerprint of unknown value and no other evidence. In his examination of the vehicle, he noted that the front driver's side door did not have a handle. The glass from the driver's side window was gone, and the window was covered with "some type of clear packing tape, . . . completely over the window' with a "slit cut in the middle of it."

On cross-examination, Sergeant Smith agreed that the rear passenger doors did not open due to "some type of child lock." He believed there may have also been a child seat in the backseat of the Hyundai. On redirect, he confirmed that the only door that opened from the outside was the front passenger door.

- 4 -

MPD Detective Robert Wilkie identified the Defendant at trial as the individual developed as a suspect following witness statements from the shooting. On January 18, 2017, the Defendant surrendered himself to a Metro Gang Unit officer. He was then transported to the Homicide Office where Detective Wilkie spoke with the Defendant. During his investigation, the detective learned that the Hyundai used at the time of the shooting belonged to the driver, Ms. Moore. Recording equipment at the Grizzly Mart malfunctioned, so police did not obtain surveillance footage. The Defendant's mother provided to police a firearm on January 19, 2017. Detective Wilkie spoke with Ms. Moore and learned that there were two children in the backseat of the Hyundai at the time of the shooting.

Dr. Kevin Jenkins testified as an expert in forensic pathology. After completing the autopsy examination, Dr. Jenkins concluded that the cause of death was multiple gunshot wounds and the manner of death was homicide. Dr. Jenkins found four gunshot wounds, three of which had bullet or bullet fragments that were recovered from the body. The injuries from the gunshot wounds were to the victim's head, torso, and right hip. The bullet that struck the victim's head entered on the back of the head on the left side. The injury sustained from this bullet caused a quick death. Another gunshot wound was located on the left side of the victim's upper back, injuring the left lung, ribs, and spine. A third gunshot wound was to the victim's left lower abdomen area. The final gunshot wound showed entry at the victim's right hip and did not impact any vital vessels or organs. The bullet entered the front of the victim's body and exited his back traveling slightly left to right and downward. Dr. Jenkins confirmed that gunshot residue samples were collected from the victim's hands and sent to the Tennessee Bureau of Investigation ("TBI"); however, the samples were not tested per TBI protocol.

TBI Special Agent Cervinia Braswell testified as an expert witness in the field of firearm identification. Related to this case, Agent Braswell received a Ruger 9 millimeter pistol and a 9 millimeter cartridge case ("evidence cartridge case"). Agent Braswell test-fired the pistol and collected the cartridge casings from the test-fire ("known cartridge cases") to compare with the evidence cartridge case. Upon comparing the evidence cartridge case with the known cartridge case she determined that the evidence cartridge case had been fired from the Ruger 9 millimeter pistol.

The State concluded the proof for its case-in-chief, and the Defendant indicated that he intended to present testimony in support of his theory of self-defense. In light of the State's proof, the trial court found that the theory of self-defense had not been fairly raised at that point in the trial. The Defendant agreed but requested a jury-out hearing for an offer of proof as a matter of efficiency. The State objected, arguing that a self-defense theory must be fairly raised before a trial court may consider issues relevant to first aggressor, and the trial court agreed.

The Defendant proceeded with presenting the following proof: Ms. Moore testified that she and the Defendant had two children, six months old and two years old at the time of the shooting. These children were in the Hyundai with them at the Grizzly Mart. She parked at gas pump four, facing away from the Grizzly Mart storefront and toward the street. Ms. Moore then went inside to pay for gas. While inside, she heard gunfire and ran from the store. The Defendant called to her, "Come on. Come on," and she got into the driver's seat of the Hyundai and drove away. She recalled being shocked and scared for the safety of her children due to threats that she received through social media and by phone after the shooting. She drove to South Memphis and stayed with the Defendant's mother until January 18, 2017, when she spoke with the police.

About the Hyundai, Ms. Moore stated that the backseat doors did not open due to child safety locks that were engaged. Her front driver's side door was broken. She explained that to enter the Hyundai she reached inside the car through a slit in the plastic that covered the broken driver's side window to open the door. The front passenger seat window also was broken and would not go up or down.

The Defendant testified that he had been staying in East Memphis for several weeks to avoid "running into any problems" in his "old neighborhood"; however, on January 13, he went home to his mother's house on Neely Road. The Defendant arranged to have his haircut at his Uncle's house and for Ms. Moore to drive him there since he was without a car. The Defendant waited at his Uncle's house for thirty minutes and when his Uncle did not arrive, he called Ms. Moore to come and get him. From there, they drove to the Grizzly Mart for gas. As they pulled into the gas station, the Defendant noticed Mr. Sanders's black Dodge Nitro. The Defendant explained that he knew Mr. Sanders and Mr. Holloway from the "neighborhood."

The Defendant testified that the Dodge Nitro parked in front of the gas station and Ms. Moore parked at gas pump four before she went inside to pay for gas. After Ms. Moore exited the car, their two-year old daughter asked to "drive." The Defendant unbuckled her and let her sit in the driver's seat. As she played, she said, "there go AJ, daddy." The Defendant said that his daughter's face "changed," and he turned to see his car door open and the victim standing over him. The victim said, "Guess who it [is]" with "a grin" on his face. The Defendant said the victim had "a snarl on his face" like he was ready to "bark."

The Defendant's daughter was standing in the driver's seat so he reached over, pushed her down, and grabbed the gun from Ms. Moore's purse. He took the gun safety off and fired. He did not recall how many times he fired only that he fired until the victim "fell back." The Defendant stated that he did not exit the vehicle at any time, and

his seatbelt remained on throughout the interaction. He heard Ms. Moore screaming, "no," and he told her to "come on." He could see Mr. Sanders approaching the Hyundai, so he urged her to leave because he was fearful. After they drove away, Ms. Moore "started screaming something about call [the Defendant's] mother." He said that he was crying hard, so Ms. Moore could not understand him when he tried to speak.

The Defendant explained that, on advice from an attorney, he did not turn himself in until five days later. He called an officer he knew and met him at a Walmart on Riverdale. He said that he "stay[ed] . . . out of the way for five days" to avoid any possible retaliatory harm. He received threats on the day of the shooting.

The Defendant confirmed that the victim was his brother-in-law and that he had shared a house with the victim and the Defendant's sister. He confirmed that he had convictions from Georgia for theft, possession of amphetamine, and possession of a firearm. He had two misdemeanor theft charges in Shelby County.

On cross-examination, the Defendant agreed that he told the police that after the victim said "guess who," he saw the victim "come out of his pocket with something" so the Defendant leaned back and fired his gun at the victim. He further agreed that he told the police that he could not see what was in the victim's hand because the door frame of the car blocked his view. The Defendant recalled that the gun used in the shooting was initially in the glove compartment but, after seeing the Dodge Nitro, he moved the gun to Ms. Moore's purse.

On redirect examination, the Defendant testified that he cooperated with the police and had the gun used in the shooting brought to the detectives. The Defendant confirmed that he never denied that he shot and killed the victim.

On recross examination, the Defendant testified that he was not in fear for his own safety but for that of his two-year-old daughter, who was in the front seat of the Hyundai when the victim approached.

Following this testimony, the Defendant announced the conclusion of the defense proof and did not renew the request for a jury-out hearing on evidence he sought to introduce related to first aggressor issues.

After hearing this evidence, the jury convicted the Defendant of second degree murder, and the trial court imposed a sentence of twenty-five years in the Tennessee Department of Correction. It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that: (1) the trial court erred by excluding evidence of the victim's "prior threats, violent provocations, and other prior bad acts toward the defendant and others," (2) the State failed to properly preserve evidence, and (3) the evidence was insufficient to support his conviction because he acted in self-defense.

## A. Prior Bad Acts

The Defendant contends that the trial court erred by not admitting evidence of the victim's "prior threats, violent provocations, and other prior bad acts" to establish the Defendant's claim that he acted out of self-defense. The State responds that the Defendant's failure to make an offer of proof precludes our review of this issue.

The admission of evidence is left to "the sound discretion of the trial judge," *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992), and "[r]elevancy is always a judicial question to be determined according to the issue which is to be tried." *Randolph v. State*, 570 S.W.2d 869, 872 (Tenn. Crim. App. 1978) (quoting *Ellison v. State*, 549 S.W.2d 691, 696 (Tenn. Crim. App. 1976)). We review a trial court's admission of evidence under an abuse of discretion standard and will reverse the decision to admit evidence only if "the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning" and admission of the evidence "caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)) (internal quotation marks omitted).

The admissibility of evidence to establish a victim's "pertinent character trait" is governed by Rule 404(a)(2), Tennessee Rule of Evidence. This rule provides:

> (a) Character Evidence Generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion, except:

> . . . .

> (2) Character of Victim. Evidence of a pertinent character trait of the victim of crime offered by an accused or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor.

The Advisory Commission Comment to this rule states that "[p]art (a) [of Rule 404] has always been the law in Tennessee for criminal prosecutions."

We note initially that, following the Defendant's testimony, the defense failed to request to make an offer of proof with regard to the witness testimony in support of the Defendant's self-defense theory. Thus, we do not have the evidence to review upon which the Defendant bases his challenge. The transcript contains some vague discussion about evidence of prior bad acts of the victim and related altercations; however, these discussions are unclear and, of course, are not evidence. On appeal, we are simply unable to ascertain the underlying factual basis supporting the Defendant's allegations that the victim had made "prior threats, violent provocations," and had committed other prior bad acts. Thus, we are left only to speculate as to the precise nature of the excluded evidence. An offer of proof is necessary to "ensure effective and meaningful appellate review." *State v. Hall*, 958 S.W.2d 679, 691 n. 10 (Tenn. 1997); Tenn. R. Evid. 103(a)(2). By failing to include the proposed testimony in the appellate record, the Defendant has waived review of this issue. Tenn. R. App. P. 13(c); Tenn. R. App. P. 36(a).

## B. *Ferguson* Claim

Next, the Defendant argues the trial court erred by refusing to grant his motion for judgment of acquittal or, alternatively, instructing the jury on missing evidence, because the State failed to test the bullet fragments recovered in this case and failed to test the victim's hands for gunshot residue. The State asserts that the Defendant has waived our review of this issue because he is raising it for the first time on appeal.

This court reviews the trial court's decision regarding the fundamental fairness of a trial conducted without the missing evidence *de novo*. *State v. Merriman*, 410 S.W.3d 779, 791 (Tenn. 2013). The trial court's findings of fact are conclusive on appeal unless the evidence preponderates against them. *See id*. This court reviews the trial court's remedy under the abuse of discretion standard. *Id*.

In *State v. Ferguson*, the Tennessee Supreme Court held that "the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d at 784 (Tenn. 2013) (citing *State v. Ferguson*, 2 S.W.3d 912, 915-16 (Tenn. 1999)). Upon determining that the due process clause under the Tennessee Constitution was broader than the due process clause under the United States Constitution, the Tennessee Supreme Court rejected the "bad faith" analysis adopted by the United States Supreme Court which provided that "'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" *Id*. at 784-85

(quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). Rather, the court in *Ferguson* adopted a balancing approach requiring the trial court to determine "'[w]hether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair.'" *Id.* at 785 (quoting *Ferguson*, 2 S.W.3d at 914).

When a *Ferguson* claim is raised, a trial court must first determine "whether the State had a duty to preserve the evidence." *Id.* "[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" *Id.* (quoting *Ferguson*, 2 S.W.3d at 917). To meet the constitutionally material evidence standard, "the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.*

If the proof establishes that the State had a duty to preserve the evidence and that the State failed in its duty, the court must conduct a balancing analysis, considering the following factors:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Ferguson*, 2 S.W.3d at 917 (footnote omitted). The trial court must balance these factors to determine whether a trial would be fundamentally fair absent the missing evidence. *Merriman*, 410 S.W.3d at 785. If the trial court determines that a trial would be fundamentally unfair without the missing evidence, "the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Id.* at 786.

In this case, the Defendant failed to raise a *Ferguson* issue at trial or in his motion for new trial. *State v. Turner*, 919 S.W. 2d 346, 356-57 (Tenn. Crim. App. 1995) ("A party may not raise an issue for the first time in the appellate court."); W*aters v. Coker*, 229 S.W.3d 682, 689 (Tenn. 2007). The Defendant did argue in his motion for new trial that the trial court erred in admitting expert testimony that his gun fired the cartridge casing found at the scene because the expert did not also test the bullet fragments recovered from the victim's body; however, the Defendant never asserted that the State

lost or destroyed exculpatory evidence. Moreover, there is no evidence in the record showing that the State lost or destroyed the bullet fragments or the gun shot residue collected from the victim's hands. The testimony at trial was that gunshot residue samples were collected from the victim's hands and sent to the TBI. The bullet fragments were entered as evidence at trial. Ultimately, the prosecutors did not deem it necessary to test the gunshot residue samples or order examination of the bullet fragments in light of all the evidence collected during the course of the investigation. As the State's brief correctly notes, the State is under no duty "to investigate cases in any particular way." *State v. Brock*, 327 S.W.3d 645, 698 (Tenn. Crim. App. 2009).

Accordingly, we conclude that the Defendant has waived our review of this issue for failing to raise it at the trial court or in the motion for new trial.

### C. Sufficiency of the Evidence

The Defendant asserts that because "any reasonable person would be in fear for their own li[f]e and especially for the life of one's own baby daughter in the situation," the evidence is insufficient to sustain his conviction. The State maintains that there is more than sufficient evidence to sustain the Defendant's conviction for second degree murder. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Second degree murder is defined as "the knowing killing of another." T.C.A. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b).

The evidence, viewed in the light most favorable to the State, showed that when the Defendant saw the victim and his friends at the gas station, he removed a loaded gun from the glove compartment box of the Hyundai and moved it to a more accessible location in Ms. Moore's purse. The Defendant was seated in the Hyundai parked at a gas pump when the victim approached to talk to the Defendant. In response to the victim saying, "Guess who it is," the Defendant retrieved the gun from Ms. Moore's purse and

fired numerous times at the unarmed victim until the victim fell back. The victim was shot four times, one of which was in the back of his head and another to the back side of his torso, and there was at least one bullet defect in the van that was parked directly behind the victim. The Defendant sustained no injuries, left the scene without rendering any aid, and remained hidden for five days before turning himself in to the police. The Defendant admitted shooting the victim and produced the gun that fired a shell casing collected at the crime scene.

This is sufficient evidence upon which a rationale jury could conclude that the Defendant knowingly shot and killed the victim when he fired at him numerous times at a close range. As to the Defendant's contention that he was in fear for the safety of his child at the time of the shooting, we note that the Defendant testified about the shooting and the jury was instructed on self-defense; however, the jury, by its verdict, discredited the theory of self-defense.

Accordingly, we conclude that the evidence is sufficient to support the jury's finding that the Defendant knowingly killed the victim. The Defendant is not entitled to relief.

### III. Conclusion

Based upon the foregoing authorities and reasoning, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE